IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| TONJA B. CARTER, in her capacity as Personal Representative of the ESTATE OF NELLE HARPER LEE, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION 18-0117-WS-B ) |
| RUDINPLAY, INC., | ) ) |
| Defendant. | ) |

**ORDER**

This matter comes before the Court on defendant's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, to Transfer Venue (doc. 13). The Motion has been extensively briefed, and is now ripe for disposition.[1] Also pending is Plaintiff's Motion to Strike (doc. 29).[2]

---

[1] Defendant's Reply (doc. 34) utilizes various formatting techniques (*i.e.*, compressed line spacing, placement of text in lengthy footnotes, use of a separate cover page for the style of the case) to skirt the 15-page limit imposed by Civil L.R. 7(e). (*Compare* doc. 34 *with* docs. 13 & 32.) Although the Court in its discretion will accept the non-conforming Reply, a far preferable approach would have been for defendant simply to request leave to exceed the page limitation.

[2] The Court recognizes, of course, that plaintiff recently filed an Emergency Motion to Enjoin Defendant Rudinplay, Inc. from further Prosecuting Second-Filed Action (doc. 30). Notwithstanding the "emergency" label on that Motion, the undersigned must first resolve the personal jurisdiction defense. If personal jurisdiction over Rudinplay were lacking, then this Court would not have authority to enjoin that defendant from doing anything. *See generally Madara v. Hall*, 916 F.2d 1510, 1514 n.1 (11th Cir. 1990) ("As a general rule, when the court is confronted by a motion raising a combination of Rule 12(b) defenses, it will pass on the jurisdictional issues before considering whether a claim was stated by the complaint.") (citation omitted); *Matthews v. Brookstone Stores, Inc.*, 469 F. Supp.2d 1056, 1061 n.2 (S.D. Ala. 2007) ("The personal jurisdiction issue must be tackled first because this Court cannot rule on D & M's other arguments if personal jurisdiction is lacking."). That said, the Court has reviewed the briefing on the Emergency Motion (docs. 30, 32, 34) insofar as it bears on the personal jurisdiction and transfer issues addressed herein.

I.      **Background.**

On March 13, 2018, plaintiff, Tonja B. Carter, in her capacity as Personal Representative of the Estate of Nelle Harper Lee, filed a Complaint (doc. 1) seeking declaratory judgment against defendant, Rudinplay, Inc. Carter filed an Amended Complaint (doc. 12) as of right on April 6, 2018. Well-pleaded allegations of the Amended Complaint reflect that Nelle Harper Lee, author of the well-known novel *To Kill a Mockingbird* (the "Novel"), was a citizen of Monroe County, Alabama, at all relevant times until her death on February 19, 2016, and that Carter is a citizen of Monroe County, Alabama. (Doc. 12, ¶¶ 1-2.) The Amended Complaint identifies Rudinplay as a New York-based theater production company whose principal is Scott Rudin. (*Id.*, ¶ 3.)

The Amended Complaint relates to a contract (the "Agreement") entered into between Lee and Rudinplay on June 29, 2015. (*Id.*, ¶ 9.) By the terms of the Agreement, Rudinplay agreed to pay Lee the sum of $100,000 in exchange for the right to adapt the Novel into a stage play (the "Play"). (*Id.*, ¶ 13.) The parties' dispute centers on Paragraph 12 of the Agreement, which provides in relevant part that "the Play shall not derogate or depart in any manner from the spirit of the Novel nor alter its characters." (Doc. 12, Exh. A, ¶ 12.) Carter, as Personal Representative of Lee's Estate, seeks a declaratory judgment that the Play developed and produced by Rudinplay violates Paragraph 12 in three specific respects, to-wit: its depiction of the legal proceedings against Tom Robinson and its alteration of the characters Atticus Finch and Jem Finch. (Doc. 12, at 13-14.) The core of the parties' dispute is whether the Play violates Paragraph 12 and, if so, whether Carter is entitled to any legal or equitable remedy under the Agreement. Carter seeks a declaratory judgment from this Court that the Play violates Paragraph 12 in the specified respects, while Rudinplay denies that any such violation exists or that the Agreement authorizes the relief sought.

For purposes of the pending Motion to Dismiss, other relevant aspects of the Agreement provide as follows: (i) a condition precedent to Lee's approval of the playwright was that such playwright must agree to certain requirements and restrictions on the Play's performances in Alabama, including "an annual performance of the Play in Monroeville, AL" and "a restriction against any license for performance of the Play within sixty (60) miles of the city limits of Monroeville, AL" (doc. 12, Exh. A, ¶ 2(a)); (ii) the Play was initially to be staged "on Broadway or in the West End of London" (*id.*, ¶ 4); (iii) Lee was to be paid certain royalties on an ongoing

basis for each production of the Play presented by or under license from Rudinplay (*id.*, ¶ 5), as well as a share of the proceeds of any sale or other disposition of subsidiary rights in the Play (*id.*, ¶ 6), and a share of net profits from the initial production (*id.*, ¶ 7); (iv) Lee was granted the right to prior, written approval of the playwright, the right to review the script of the Play, and the right to make comments (*id.*, ¶ 12); and (v) if Lee had concerns with the script, then Rudinplay was to be given prompt notice and an opportunity to discuss resolution of same (*id.*).

Rudinplay has now filed a Motion to Dismiss pursuant to Rule 12(b)(2), Fed.R.Civ.P., or alternatively, to transfer this action to the U.S. District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a). In support of this Motion, Rudinplay submits evidence of the following facts: (i) Rudinplay is a New York-based company with its principal place of business in New York; (ii) neither Rudinplay nor its principal, Scott Rudin, has any relationship to or maintains any ongoing contacts with Alabama; (iii) Rudinplay did not negotiate the Agreement directly with Lee in Alabama, but instead dealt with her New York-based attorney and Andrew Nurnberg, her London-based literary agent; (iv) the Agreement was addressed to Lee in care of Nurnberg in the United Kingdom; (v) Rudinplay and its agents did not negotiate with anyone in Alabama; (vi) Rudinplay paid the requisite $100,000 to Lee under the Agreement by mailing a check to Nurnberg in London, England; (vii) Rudinplay sent the draft script to Nurnberg in London; (viii) Rudinplay communicated with Nurnberg in London about the script and the Play in September 2017, and met with Nurnberg and plaintiff, Carter, in New York in February 2018 to discuss the script; and (ix) the Play is currently set to premiere in New York on December 13, 2018, and is being developed, rehearsed and produced entirely in New York. (Doc. 13, at 6-8.) According to defendant, "the *only* contact between Rudinplay and Alabama" was a single brief telephone call between Rudinplay and Carter on September 25, 2017. (*Id.* at 2-3.) On that basis, Rudinplay seeks dismissal of this action for lack of personal jurisdiction or, alternatively, transfer to the Southern District of New York.

**II.     Analysis.**

    ***A.     Personal Jurisdiction and Rudinplay.***

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a *prima facie* case of jurisdiction." *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (similar).

"A *prima facie* case is established if the plaintiff presents affidavits or deposition testimony sufficient to defeat a motion for judgment as a matter of law." *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010). "It goes without saying that, where the defendant challenges the court's exercise of jurisdiction over its person, the plaintiff bears the ultimate burden of establishing that personal jurisdiction is present." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009) (citation omitted). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (citation omitted).

### 1. *Jurisdictional Facts.*

Carter has submitted both factual allegations in her Amended Complaint and affidavits and other exhibits in an effort to meet her burden of establishing this Court's personal jurisdiction over Rudinplay. The jurisdictional facts shown by Carter (construing all reasonable inferences and resolving all evidentiary conflicts in her favor) include the following: On October 14, 2013, defendant's agent David Rogers contacted Carter, who was Lee's attorney and co-literary agent, at Carter's office in Monroeville, Alabama via both voicemail and e-mail. (Carter Decl. (doc. 28, Exh. 5), at ¶¶ 3, 4, 7 & Exh. B.) In those communications, Rogers identified himself as Scott Rudin's director of development, and wrote, "We are curious to know who controls dramatic rights for TO KILL A MOCKINGBIRD, and with whom we might have a conversation about major stage adaptations." (*Id.* at ¶ 7 & Exh. B.)[3] The October 14 e-mail specified that Rogers had also left Carter "a voicemail at Barnett, Bugg, Lee & Carter," a Monroeville, Alabama law firm. (*Id.* at ¶¶ 2, 7 & Exh. B.) On October 16, 2013, Rogers sent another e-mail to Carter in Monroeville, Alabama, stating that he "wanted to follow up" and that "[w]e are eager as ever to hear from you." (*Id.* at ¶ 8 & Exh. C.) An exchange of multiple e-

---

[3] In its Reply, defendant attempts to distance itself from Rogers, repeatedly characterizing him as a "former employee of Rudinplay." (Doc. 34, at 2, 5.) Any suggestion that Rogers' communications with Carter are not attributable to Rudinplay for jurisdictional purposes is undermined both by Rudin's admission that he "had instructed Mr. Rogers to find out who controlled the stage rights to the Novel" (doc. 34-1, ¶ 2), and by Rogers' statement in the e-mail communications to Carter identifying himself as "Scott Rudin's director of development" (Carter Decl., at Exh. B). In light of these undisputed facts, the Court readily concludes that Rogers' contacts with Alabama on Rudinplay's behalf (and at Rudinplay's express direction) "count" for purposes of a personal jurisdiction analysis as to Rudinplay.

mails between Carter and Rogers followed, with Carter identifying the current dramatic rights holders, and Rogers inquiring, "What if we were interested in commissioning a new adaptation, would that conversation begin with you?" (*Id.* at ¶ 9 & Exh. D.) In response to Rogers' question, Carter answered affirmatively, then put Rogers in touch with Carter's "co-agent Andrew Nur[n]berg." (*Id.* at ¶ 9 & Exh. F.) Those overtures by and communications between Rudinplay's agent and Carter in Alabama jumpstarted the dialogue that culminated in the Agreement between Lee and Rudinplay. (*Id.* at ¶ 10.)[4] The Agreement was signed by Lee in Monroeville, Alabama. (*Id.* at ¶ 13.)

Plaintiff's evidence also shows a series of interactions between Rudinplay's principal, Scott Rudin, and Carter after dissemination of a draft script. On September 25, 2017, Rudin contacted Carter telephonically in Monroeville, Alabama, to discuss her initial reaction to the script. During the ensuing 30-minute conversation, Carter expressed reservations to Rudin that the script altered certain characters (including Atticus Finch) and was not consistent with 1930s small-town Alabama. (*Id.* at ¶ 17.)[5] Rudin reassured Carter that he would address those concerns to make sure the Estate would be satisfied with the final product. (*Id.*) Months later, on February 16, 2018, Carter participated in an in-person meeting with Rudin in New York to air her concerns about the latest version of the script, particularly those pertaining to alleged alteration of characters (Atticus Finch and Jem Finch), alteration of the story as to the legal proceedings against Tom Robinson, and failure to depict fairly 1930s small-town Alabama. (*Id.* at ¶ 19.) Rudin was not receptive to Carter's critique. (*Id.*) Discussions between Carter and Rudinplay escalated in the form of an exchange of letters in early March 2018. (*Id.* at ¶¶ 20-21.) In particular, on March 5, 2018, Carter sent a lengthy letter to Rudinplay in New York from her

---

[4] Plaintiff's evidence is that, during the course of those negotiations, Rudinplay president Scott Rudin "offered on more than one occasion to arrange a press event in Monroeville[, Alabama] to announce that the Play would be presented in Monroeville." (Nurnberg Decl. (doc. 28, Exh. 6), ¶ 6.) Of course, no such press event has taken place to date.

[5] In its Reply, Rudinplay takes issue with plaintiff's characterization of the September 25 telephone call. Specifically, Rudinplay submits a declaration from Rudin stating, "The conversation was a very short one, lasting only about five minutes, and Ms. Carter made only a few minor, non-substantive comments." (Doc. 34-1, ¶ 14.) As noted *supra*, the Court must construe all reasonable inferences in favor of the plaintiff on Rule 12(b)(2) review; therefore, for purposes of this Order, the Rudin Declaration cannot and will not be credited as to the nature and duration of the September 25 conversation.

office in Alabama chronicling her dissatisfactions with the script and her contention that it violated Paragraph 12 of the Agreement in numerous ways. (*Id.* at ¶ 20.) On March 9, 2018, Rudinplay's New York counsel sent a letter to Carter's Monroeville, Alabama address responding to her expressions of concern, indicating that Rudinplay "wants to work with the Estate of Harper Lee, as appropriate, regarding this project," emphasizing that it was "no longer possible" to make extensive changes to the script, and proposing another in-person meeting in New York because Rudin's schedule precluded him from travelling to Monroeville. (*Id.* at ¶ 21 & Exh. G.) Four days later, Carter filed her Complaint in this District Court seeking a declaratory judgment that the Play violates Paragraph 12 of the Agreement.

### 2. *Minimum Contacts and Due Process.*

It is well settled that "Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible." *Sloss Industries Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007). Therefore, the critical question for purposes of the pending Rule 12(b)(2) Motion is whether the exercise of personal jurisdiction over Rudinplay here would comport with due process guarantees. Carter's position is that due process permits the exercise of personal jurisdiction over Rudinplay on a specific jurisdiction theory. "Specific jurisdiction refers to jurisdiction over causes of action rising from or related to a defendant's actions within the forum." *PVC Windoors*, 598 F.3d at 808 (citation and internal quotation marks omitted). Specific jurisdiction is appropriate if "the defendant's suit-related conduct … create[s] a substantial connection with the forum State." *Walden v. Fiore*, 134 S.Ct. 1115, 1121, 188 L.Ed.2d 12 (2014). "In specific personal jurisdiction cases, we apply the three-part due process test, which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Luis Vuitton*, 736 F.3d at 1355 (citations omitted). Carter bears the burden of establishing each of the first two prongs, after which Rudinplay must make a "compelling case" that exercising jurisdiction would violate traditional notions of fair play and substantial justice. *Id.*

As noted, the first prong of the specific jurisdiction analysis examines whether the plaintiff's claims arise out of or relate to the defendant's forum contacts. *See Louis Vuitton*, 736

F.3d at 1355 ("A fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum.") (citation and internal marks omitted). This inquiry "must focus on the direct causal relationship between the defendant, the forum, and the litigation." *Id.* at 1355-56 (citations omitted). It cannot reasonably be disputed that Carter's claims arise out of Rudinplay's contacts with Alabama. After all, those Alabama contacts include Rudinplay reaching out to Harper Lee's attorney in Alabama about adapting the Novel into a play, entering into an agreement with Lee about such a stage adaptation, and having communications with the Estate's attorney (Carter) in Alabama concerning the implementation of that agreement. The claims presented by Carter against Rudinplay in the Amended Complaint plainly satisfy the "arising out of" or relatedness prong, and the requisite relationship among Rudinplay, Alabama, and Carter's Amended Complaint is easily demonstrated. Defendant does not argue otherwise. The first prong is satisfied.

At the heart of the parties' jurisdictional dispute is the second prong of the due process test for specific jurisdiction, which requires Carter to show that Rudinplay purposefully availed itself of the privilege of conducting activities in Alabama, thus invoking the benefit of Alabama's laws. The traditional test for purposeful availment, which applies here, focuses on whether the defendant has minimum contacts with the forum state. *See, e.g., Luis Vuitton*, 736 F.3d at 1357 (describing and applying "the traditional minimum contacts test for purposeful availment applicable in contract and tort cases alike"). This test looks to whether the nonresident defendant's contacts with the forum state "(1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Id.* (citation omitted). "[W]hen inspecting a contractual relationship for minimum contacts, we follow a 'highly realistic approach' that focuses on the substance of the transaction: prior negotiations, contemplated future consequences, the terms of the contract, and the actual course of dealing." *Diamond Crystal*, 593 F.3d at 1268 (citation omitted).[6]

---

[6] In applying the minimum contacts test, the undersigned is mindful of the Eleventh Circuit's admonition that "neither merely contracting with a forum resident nor the forum resident's unilateral acts can establish sufficient minimum contacts." *Diamond Crystal*, 593 F.3d
(Continued)

Utilizing the Eleventh Circuit's "highly realistic approach," the Court readily concludes that Rudinplay had sufficient minimum contacts with Alabama to satisfy the purposeful availment prong. A critical fact – conspicuously omitted from defendant's Rule 12(b)(2) Motion – is that Rudinplay initiated contact with Harper Lee's representatives in Alabama via a series of persistent communications (electronic and voice) in October 2013. Indeed, Rudinplay deliberately reached out to Lee's personal counsel in Alabama in a targeted manner for the purpose of soliciting a continuing business relationship with Lee in Alabama. That fact alone weighs heavily in favor of a finding of purposeful availment.[7] As for contemplated future consequences of the contract, contrary to defendant's unsupported characterization, Rudinplay and Lee did not enter into "an isolated transaction for a one-time grant of rights." (Doc. 13, at 13, 15.) Rather, as reflected in both the terms of the Agreement and the parties' discussions relating to same, both sides anticipated an ongoing business relationship spanning a period of years relating to the adaptation of the Novel into a play, including, *inter alia*, (i) Lee designating Rudinplay as her sole and exclusive agent for a 12-month period to procure a playwright for such adaptation; (ii) Lee's right to approve or reject the playwright selected by Rudinplay; (iii)

---

at 1268; *see also DocRX, Inc. v. DOX Consulting, LLC*, 738 F. Supp.2d 1234, 1247 (S.D. Ala. 2010) (similar). Rather, "[t]he focus must always be on the *nonresident defendant's* conduct, that is, whether the defendant deliberately engaged in significant activities within a state or created continuing obligations with residents of the forum." *Diamond Crystal*, 593 F.3d at 1268; *see also Walden*, 134 S.Ct. at 1122-23 (emphasizing that "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him," but also recognizing that "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties").

[7] *See, e.g., Diamond Crystal*, 593 F.3d at 1268-69 (plus factors favoring exercise of personal jurisdiction include "a defendant's initiating the contractual relationship"); *Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 994 (11th Cir. 1986) ("A direct solicitation by a foreign defendant of the business of a forum resident has been held to be 'purposeful availment' in cases where … a continuing relationship … was contemplated.") (citations and footnote omitted); *Paul Hastings, Janofsky & Walker, LLP v. City of Tulsa, OK*, 245 F. Supp.2d 1248, 1257 (N.D. Ga. 2002) ("Various decisions have relied heavily on the initiation of contact in finding a defendant subject to specific jurisdiction …."); *Allegiant Physicians Services, Inc. v. Sturdy Memorial Hosp.*, 926 F. Supp. 1106, 1114 (N.D. Ga. 1996) (opining that "great weight is placed upon who initiated the transaction" and that "courts in this Circuit have found jurisdiction proper where a non-resident reaches out and establishes contact with a [resident] plaintiff").

Rudinplay having a 24-month option to produce an initial first-class production of the Play on Broadway or in the West End of London; (iv) Rudinplay paying certain royalties and net profits to Lee; (v) Lee having the right to review and comment on the script; (vi) Lee being required to notify Rudinplay of concerns that the Play derogates or departs from the spirit of the Novel or alters its characters; (vii) Rudinplay being afforded an opportunity to discuss with Lee any resolution of such concerns; and (viii) the possibility that Rudinplay would arrange a press event in Monroeville, Alabama to announce a local professional presentation of the Play.[8]

Simply put, the Lee/Rudinplay business relationship was contemplated by the parties to be a far cry from the "one-shot operation" at issue in *Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 994 (11th Cir. 1986), to which Rudinplay would liken this case. (*See* doc. 13, at 13.) This distinction is important because Supreme Court teachings confirm that "with respect to interstate contractual obligations, … parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 473, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citations and internal quotation marks omitted). After all, "where individuals purposefully derive benefit from their interstate activities, … it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; ***the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed***." *Id.* at 474 (emphasis added and citation omitted). That principle is dispositive of Rudinplay's jurisdictional argument. Rudinplay reached out from New York, actively sought out and deliberately created a continuing business relationship – along with attendant continuing obligations – with Lee in Alabama for the purpose of deriving benefit.

---

[8] Defendant correctly points out that the final item in this list was never formalized in the Agreement itself; however, that detail is of negligible jurisdictional significance. Again, plaintiff's evidence shows that Rudinplay repeatedly volunteered to provide such a service to Lee during contract negotiations. This evidence not only sheds light on the parties' contemplated future consequences of entering into the Agreement, but also shows Rudinplay's willingness and intention to perform actions in and to be physically present in Alabama in furtherance of its contemplated ongoing business relationship with Lee. An isolated, discrete, one-and-done transaction this was not.

Having intentionally pursued and voluntarily assumed such obligations in Alabama, Rudinplay cannot utilize the Due Process Clause to evade litigation concerning those obligations here.

This conclusion is reinforced by the parties' actual course of dealing. Although Rudinplay professes to have no connection to Alabama because it negotiated the Agreement through Lee's representatives in New York and England, Rudinplay well knew that it was forming a business relationship not with a lawyer in New York or a literary agent in London, but rather with an author in Alabama. Again, Rudinplay did not initially reach out to a business contact in England, but instead solicited Lee's personal attorney in her hometown of Monroeville, Alabama. When disagreements arose as to the substance of the script and its compliance or lack thereof with Paragraph 12, Rudinplay had a direct, substantive, 30-minute telephone conversation with Carter (as personal representative of Lee's Estate) in Alabama in September 2017. When the dispute escalated in March 2018, letters were exchanged between Rudinplay in New York and Carter in Alabama. The point is simple: through this course of dealing, Rudinplay was plainly aware that its purposeful acts vis a vis the Agreement and the interpretation/enforcement of same would have direct effects in Alabama, such that it should have reasonably anticipated being haled into court in this forum, thereby satisfying minimum contacts. *See, e.g., Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 258 (11th Cir. 1996) (for purposeful availment inquiry, "the defendant's conduct and connection with the forum must be of a character that he should reasonably anticipate being haled into court there"); *Madara v. Hall*, 916 F.2d 1510, 1516-17 (11th Cir. 1990) (for "purposeful availment" analysis, "the kind of foreseeability critical to the proper exercise of personal jurisdiction is … that the defendant's own purposeful acts will have some effect in the forum").

In sum, the Court finds upon careful application of the Eleventh Circuit's "highly realistic approach," considering the substance of the transaction including prior negotiations, contemplated future consequences, contract terms, and actual course of dealing, that plaintiff has met her burden of showing purposeful availment. Plaintiff's evidence shows that Rudinplay deliberately reached out beyond New York and created continuing relationships and obligations with Harper Lee (and, later, her Estate) in Alabama pertaining to the stage adaptation of the Novel. Pursuant to those ongoing relationships, Rudinplay was designated as Lee's exclusive agent to procure a playwright, Lee had the right to approve or reject the playwright, the script was subject to review and comment by Lee (with notice to and discussion with Rudinplay to

resolve any concerns), Rudinplay was to pay a stream of royalty and other payments to Lee, Rudinplay volunteered to put on a press event in Alabama for the Play, and when the relationship soured there were multiple direct communications between Rudinplay and Carter in Alabama. In light of these and other facts and circumstances, Rudinplay is properly subject to regulation and sanctions in Alabama to account for the proximate consequences of its activities. The exercise of jurisdiction over Rudinplay in this matter would not offend the Due Process Clause.

Of course, a finding of purposeful availment does not conclude the due process inquiry. Carter having satisfied the first two prongs of the test, Rudinplay "must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Diamond Crystal*, 593 F.3d at 1267. The Eleventh Circuit has emphasized that "only in highly unusual cases" will this requirement be satisfied, and only where the defendant "demonstrate[s] that the assertion of jurisdiction in the forum will make litigation so gravely difficult and inconvenient that he unfairly is at a severe disadvantage in comparison to his opponent." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 948 (11th Cir. 1997) (citation and internal marks omitted). In its Motion and principal brief, defendant articulates no argument, much less a "compelling case," that exercise of jurisdiction over Rudinplay in Alabama would offend traditional notions of fair play and substantial justice. Rudinplay appears fully able to defend its interests in this forum without significant hardship or perceptible disadvantage; therefore, it has not met and cannot meet its burden on the third prong.

For all of these reasons, the Court concludes that personal jurisdiction is properly exercised over defendant, Rudinplay, Inc., in this forum on a specific jurisdiction theory pursuant to *Burger King v. Rudzewicz* and its progeny. The Motion to Dismiss for Lack of Personal Jurisdiction is, therefore, **denied**. In order to adjudicate fully the Rule 12(b)(2) Motion, the Court need not reach Plaintiff's Motion to Strike Paragraphs 7, 8 and 9 of Declaration of Stefan Schick (doc. 29). The Motion to Strike is **moot**.

### B. Transfer Pursuant to 28 U.S.C. § 1404.

#### 1. Governing Legal Principles.

In the alternative, Rudinplay moves for transfer of venue to the U.S. District Court for the Southern District of New York on the grounds that it "is a more convenient forum." (Doc. 13, at 18.) The applicable statute provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division

where it might have been brought." 28 U.S.C. § 1404(a). As a general proposition, district courts have broad discretion in deciding whether to transfer an action to a more convenient forum, with the movant bearing the burden of establishing that the proposed transferee forum is more convenient. *See, e.g., Brown v. Connecticut General Life Ins. Co.*, 934 F.2d 1193, 1197 (11th Cir. 1991) ("The decision to transfer a case to another district is left to the sound discretion of the trial court."); *SE Property Holdings, LLC v. Center*, 2015 WL 4478154, *3 (S.D. Ala. July 21, 2015) ("[I]n the usual motion for transfer under section 1404(a), the burden is on the movant to establish that the suggested forum is more convenient.") (citation omitted); *Prou v. Giarla*, 62 F. Supp.3d 1365, 1382 (S.D. Fla. 2014) ("The court has the discretion to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness.") (citations and internal quotation marks omitted).

"In the typical case …, a district court considering a § 1404(a) motion … must evaluate both the convenience of the parties and various public-interest considerations." *Atlantic Marine Const. Co. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 62, 134 S.Ct. 568, 187 L.Ed.2d 487 (2013). The former category of factors includes "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id.* at 62 n.6 (citation omitted). The latter category encompasses considerations of "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* "The Court must also give some weight to the plaintiffs' choice of forum." *Id.*

### 2. *Private-Interest Factors.*

The private-interest factors weigh heavily in favor of transferring venue to the Southern District of New York.[9] Access to sources of proof and convenience of witnesses are critically

---

[9] Of course, an important threshold question to a § 1404(a) transfer is whether the proposed transferee court is one in which the civil action "might have been brought." 28 U.S.C. § 1404(a). "An action 'might have been brought' in a proposed transferee court if that court has jurisdiction over the subject matter of the action, if venue is proper there, and if the defendant is amenable to process issuing out of transferee court." *Miot v. Kechijian*, 830 F. Supp. 1460, 1465 (S.D. Fla. 1993) (citation omitted); *see also Prou*, 62 F. Supp.3d at 1382 ("An adequate (Continued)

-12-

important considerations that favor transfer in this case. *See, e.g., Montgomery v. Oberti*, 945 F. Supp.2d 1367, 1375 (S.D. Fla. 2013) ("Perhaps the most important 'private interest' of the litigants is access to evidence.") (citation omitted). The Amended Complaint raises two key issues, to-wit: (i) whether the Play derogates or departs from the spirit of the Novel or alters its characters, so as to violate Paragraph 12 of the Agreement; and (ii) if so, what remedy might be available to the Estate under Paragraph 12 for such a violation.[10] To the best of the Court's discernment, the overwhelming majority of witnesses and evidence pertaining to these issues may be found in the Southern District of New York, not the Southern District of Alabama. Determination of the proper construction and interpretation of Paragraph 12, as well as the parties' intentions concerning remedies, may be aided by (or even necessitate) testimony from those involved in negotiating the Agreement. None of those witnesses are located in Alabama, and most of them are in New York.[11]

---

alternative forum exists where jurisdiction is proper, venue is proper, and the parties are amenable to service of process in the transferee forum.") (citations and internal quotation marks omitted). Rudinplay has argued – and Carter has not disputed in her Opposition Brief (doc. 28, at 25-30) – that the Southern District of New York is an adequate alternative forum. By all appearances, that court would have subject matter jurisdiction over this case; venue would be proper there because "a substantial part of the events or omissions giving rise to the claim occurred" there, supporting venue under 28 U.S.C. § 1391(b)(2); and specific jurisdiction would exist over Carter in her capacity as personal representative of the Estate given (among other things) her communications with Rudinplay in New York, her travel to New York for a face-to-face meeting with Rudinplay about this dispute, and the parties' clearly stated intention that the Play may be staged on Broadway in New York. For all of these reasons, the Court readily finds that the Southern District of New York is a forum in which this civil action "might have been brought," rendering it an eligible transferee court under § 1404(a).

[10] Plaintiff has embraced this characterization of the claims presented in the Amended Complaint. Indeed, Carter has written, "There are two distinct components to the declaratory relief sought by the Estate in this case. The first pertains to the dispute concerning the remedy available to the Estate under Paragraph 12 of the Contract. … As for the second component of the declaratory relief sought by the Estate – whether the Play, in fact, derogates or departs in any manner from the spirit of the Novel or alters its characters …." (Doc. 30, at 9-10.)

[11] Indeed, the Agreement was negotiated between and among Scott Rudin (who lives in New York), Rudinplay's New York-based law firm Loeb & Loeb LLP, Lee's New York-based attorney Timothy O'Donnell, and Lee's London-based literary agent Andrew Nurnberg. (Rudin Decl. (doc. 13-1), ¶ 11; Schick Decl. (doc. 13-2), ¶ 4.) For her part, Carter does not allege that she participated directly in the Agreement's negotiations, but simply indicates that (Continued)

Moreover, Rudinplay has persuasively suggested that adjudication of whether Paragraph 12 has been violated (*i.e.*, whether the Play derogates or departs from the spirit of the Novel or alters its characters) cannot be made solely on the basis of a cold printed script, but may require the finder of fact to view a live presentation of the Play itself.[12] The Play is being developed, rehearsed and produced entirely in New York, not in Alabama. (Rudin Decl. (doc. 13-1), ¶ 18.) Most of the Play's major cast members either reside or work in New York, not in Alabama. (Rudin Decl. II (doc. 34-1), ¶ 17.) To be clear, the Court makes no definitive ruling that Rudinplay is or is not entitled to stage a live presentation of the Play as part of the trial of this action. What the Court is saying, however, is that (i) the trial court may deem it beneficial, or even necessary, for the finder of fact to observe a live performance of the Play in order to resolve the question of whether Rudinplay has or has not violated Paragraph 12; and (ii) as a practical matter, that option will be available to the trial judge and parties only if venue is transferred to the Southern District of New York, inasmuch as it would be cost-prohibitive, massively

---

Nurnberg "kept [her] informed about his discussions with Mr. Rudin." (Carter Decl. (doc. 28, Exh. 5), ¶ 11.) It thus appears that neither Carter nor anyone else in the State of Alabama is in a position to testify as to the proper meaning and interpretation of Paragraph 12, whereas multiple New York-based witnesses are. To be sure, the Estate identifies Carter as an important witness because she "has personal knowledge of facts relating to Ms. Lee's intent in this transaction" (doc. 28, at 28 n.28); however, plaintiff has proffered no such evidence. At any rate, it is far from obvious that either (i) Carter actually possesses personal knowledge of Harper Lee's intent so as to satisfy Rule 602, Fed.R.Evid., or (ii) even if she did, such testimony would be admissible under Rule 801, Fed.R.Evid.

[12] Carter summarily rejects Rudinplay's contention, framing it as "untenable," "absurd" and "makes no sense" within the context of Lee's script-review rights under Paragraph 12. (Doc. 28, at 15 n.13.) The undersigned does not share plaintiff's sense of absolutism on this point. For example, Carter's Amended Complaint seeks a declaratory judgment that "[t]he Play alters the character of Atticus Finch and thereby violates Paragraph 12 of the Contract." (Doc. 12, at 14.) The "character of Atticus Finch" in the Play is comprised not solely of the lines of dialogue he speaks, as memorialized in a script, but also includes body language, demeanor, tone of voice, inflection, appearance, and numerous other facets that may only be discerned from viewing an actor's portrayal of that character in the Play. Paragraph 12 provides that "the Play shall not … alter [the Novel's] characters." Thus, what matters for Paragraph 12 is the Play, not just the script. It stands to reason that an evaluation of Rudinplay's compliance or lack thereof with Paragraph 12 may call for inquiry and evidentiary presentation beyond mere review of the script, and may benefit materially from actualization of that script in the form of a live performance of the Play.

inconvenient, and in all likelihood logistically impossible to compel the entire stage production to relocate from New York to Alabama for trial.

The point is straightforward: Carter's Amended Complaint raises two critical issues as to which she seeks a declaratory judgment. The first is whether the Play as contemplated by Rudinplay derogates or departs from the spirit of the Novel or alters its characters, so as to violate Paragraph 12 of the Agreement. The second is what Paragraph 12 actually means, and what remedies (if any) it confers upon the Estate in the event that Rudinplay's Play does derogate or depart from the Novel's spirit or alters its characters. As shown above, the bulk of the witnesses and evidence that will be necessary to answer those questions is found in New York, not in Alabama. Some of those potential witnesses and evidence are highly unlikely to be available in an Alabama forum at all. In light of these circumstances, the Court concludes that the relevant private-interest factors heavily favor a § 1404(a) transfer.

### 3. *Public-Interest Factors.*

Turning now to the public-interest factors, courts have considered administrative difficulties flowing from court congestion, local interest in having localized controversies decided at home, and the interest in having the forum be comfortable with and conversant in the governing law. *See, e.g., Carucel Investments, L.P. v. Novatel Wireless, Inc.*, 157 F. Supp.3d 1219, 1229 (S.D. Fla. 2016). These factors are either neutral or point modestly in favor of transferring this action to New York. Most notably, the Agreement provides that "[a]ll matters concerning this Agreement and its validity, performance or breach shall be governed by the law of the State of New York applicable to contracts made and performed entirely therein." (Doc. 12, Exh. A, ¶ 16.) Although Rudinplay has identified no particular quirks, quagmires or idiosyncrasies of New York law that might place this Court at a disadvantage relative to a New York court in adjudicating this matter, that factor marginally favors a transfer of venue. Also, the locus of the controversy is found in New York, not in Alabama. After all, the parties' dispute concerns an Agreement that was negotiated in New York, not in Alabama; and relates to a theatrical production of a Play that is intended to be staged in New York by a New York production company involving a New York-based cast. Thus, this controversy is more localized to New York than it is to Alabama, a fact which also favors transfer. On balance, the public-interest factors are not major considerations in the § 1404(a) calculus in this case. To the extent they do come into play, however, they point in the direction of granting the Motion to Transfer.

## 4. *Plaintiff's Choice of Forum.*

In the face of this evidence and argument relating to private-interest and public-interest factors, Carter relies heavily on the fact that she selected an Alabama forum, not a New York forum, for this dispute. Circuit law generally accords deference to a plaintiff's choice of forum. *See, e.g., Bartronics, Inc. v. Power-One, Inc.*, 510 F. Supp.2d 634, 637 (S.D. Ala. 2007) ("a plaintiff's choice of forum should be honored so long as venue is proper there, unless substantial countervailing considerations militate to the contrary") (citations omitted).[13] But that deference is attenuated in certain circumstances. For example, it is well-settled that a plaintiff's choice of forum is entitled to less deference in the § 1404(a) analysis where the locus of operative facts lies elsewhere. *See, e.g., Johnston v. Foster-Wheeler Constructors, Inc.*, 158 F.R.D. 496, 505 (M.D. Ala. 1994) ("Where none of the conduct complained of took place in the forum selected by Plaintiff, the Plaintiff's choice of forum is of minimal value in determining whether to transfer an action.").[14] As discussed *supra*, the Agreement was not negotiated in Alabama. When a dispute arose between the parties as to whether the Play complied with Paragraph 12, the parties conducted an in-person meeting in New York. The Play is being developed in New York for a New York production. All of these operative facts occurred in places other than Alabama; therefore, the deference due Carter's choice of forum is diminished.[15]

---

[13] *See also Carucel*, 157 F. Supp.3d at 1225 ("Traditionally, a plaintiff's choice of forum is accorded considerable deference.") (citations omitted); *Weintraub v. Advanced Correctional Healthcare, Inc.*, 161 F. Supp.3d 1272, 1284 (N.D. Ga. 2015) ("In the absence of a clear difference in convenience, the plaintiff's choice of forum is determinative.") (citations omitted).

[14] *See also GoITV, Inc. v. Fox Sports Latin America Ltd.*, 277 F. Supp.3d 1301, 1322 (S.D. Fla. 2017) ("the deference usually afforded to the plaintiff's choice of forum is diminished where the locus of operative facts lies elsewhere"); *Carucel*, 157 F. Supp.3d at 1225 ("However, where the operative facts underlying the cause of action did not occur within the forum chosen by the Plaintiff, the choice of forum is entitled to less consideration.") (citations omitted); *Liberty Nat'l Life Ins. Co. v. Suntrust Bank*, 2012 WL 3849615, *11 (N.D. Ala. Sept. 5, 2012) ("[T]he locus of operative facts underlying Liberty National's claims occurred in Florida, not Alabama. … Therefore, Liberty National's choice of forum – the Northern District of Alabama – is entitled to minimal deference.").

[15] In contesting this conclusion, Carter identifies five facts that she says occurred in Alabama. (Doc. 28, at 29.) The trouble with plaintiff's argument is threefold. First, the applicable legal standard does not state that the deference given a plaintiff's selected forum is reduced only where <u>all</u> facts occurred somewhere else. Second, certain of the "operative facts" (Continued)

Additionally, the equities of the situation do not warrant strict adherence to Carter's selection of an Alabama forum. In March 2018, the parties commenced a short-lived dialogue about Carter's concerns with the latest draft script for the Play. On March 9, 2018, Rudinplay sent Carter a letter (responding to Carter's letter of March 5, 2018) emphasizing that Rudinplay "want[s] to work with the Estate of Harper Lee, as appropriate, regarding this project," and that Rudinplay's principal "would be very happy to get together with you" to attempt to work through Carter's concerns. (Carter Decl., Exh. G, at 1.) The March 9 letter concluded that Rudinplay "would like to consult with you to discuss with you your concerns, and to see if it is possible to resolve at least some of them." (*Id.* at 3.) These sentiments aligned neatly with Paragraph 12 of the Agreement's requirement that if Lee believed the Play derogated or departed from the Novel's spirit, or altered its characters, then Rudinplay "will be afforded an opportunity to discuss with [Lee] resolutions of any such concerns." Yet Carter spurned this good-faith invitation to meet and discuss her concerns with Rudinplay, as well as her consultation obligation under Paragraph 12 of the Agreement. Instead, she rushed to court and precipitously filed the instant Complaint just four days later, on March 13, 2018, in what certainly appears to be an attempt to shirk contractual duties and beat Rudinplay to the punch. (*See* doc. 1.)[16] The

---

recited by Carter (*i.e.*, the initial contact made by Rudinplay's representative to Carter in 2013, Carter's review of the early draft script in Alabama in September 2017) are not of central importance to resolving the issues joined in this litigation, but are more in the nature of background. Third, certain other "operative facts" recited by Carter (*i.e.*, Lee's execution of the Agreement in Alabama, Carter's participation in a telephone call in Alabama, Carter's receipt of a letter in Alabama) are facts that took place equally in New York (*i.e.*, Rudinplay's execution of the Agreement in New York, Rudin's participation in that telephone call in New York, Rudinplay's transmission of a letter to Carter from New York). Thus, notwithstanding Carter's recitation of a few discrete facts that she says took place in Alabama, the conclusion remains intact that the locus of operative facts occurred elsewhere.

[16]     In subsequent filings in this matter, Carter has endeavored to justify her course of conduct in this regard by arguing that she filed suit because, upon receipt of the March 9 letter, "it was clear to the Estate that any further discussions on those fundamental issues would be futile – so there was no basis to pursue them." (Doc. 30, at 10.) However, the March 9 letter cannot fairly, reasonably be read as demonstrating an impasse or establishing that any further consultation between the parties under Paragraph 12 would be futile; to the contrary, the March 9 letter clearly, unambiguously evinces Rudinplay's desire and willingness to work with Carter to address her concerns. To be sure, Carter makes much of the letter's observations that "[t]here is a limited time to make extensive changes in the script" and that Carter "[h]aving waited so long
(Continued)

Court finds that this circumstance favors diminution of the deference afforded Carter's choice of forum, as a matter of equitable principles.

In sum, the Court concludes that private-interest factors strongly favor transfer of this action to the Southern District of New York, and that public-interest factors are neutral or modestly favor such transfer. While plaintiff's choice of forum is entitled to consideration, it receives less deference here than it otherwise might because the locus of operative facts occurred outside of Alabama and because of equitable concerns regarding the timing and circumstances of Carter's filing of her Complaint in this forum. The Court has carefully considered all of these factors, duly recognizing that defendant bears the burden of establishing that the proposed transferee forum is more convenient than this one. Upon doing so, the Court exercises its discretion under 28 U.S.C. § 1404(a) to **grant** Rudinplay's Motion to Transfer, and to transfer this action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a), for the convenience of the parties and witnesses, and in the interest of justice.[17]

---

to make comments, it is unreasonable to expect that extensive changes can be achieved" at this time. (Carter Decl., Exh. G, at 2-3.) Contrary to plaintiff's characterization, however, these statements do not rationally support a conclusion that "Rudinplay slammed the door on meaningful discussions" between the parties in the March 9 letter. (Doc. 30, at 11 n.4.) Under any fair reading, the March 9 letter expressed Rudinplay's interest in working to explore a reasonable compromise that both sides could live with. Carter's response of racing to court to file a preemptive suit may not have been "anticipatory" in the strictest sense, but it does constitute inequitable gamesmanship, given all the surrounding facts and circumstances, and warrants reduced deference to her choice of forum. *See, e.g., Seeberger Enterprises, Inc. v. Mike Thompson Recreational Vehicles, Inc.*, 502 F. Supp.2d 531, 538 (W.D. Tex. 2007) (according less deference to plaintiffs' choice of forum where there were both legitimate and tactical motivations for plaintiffs filing first in their home district); *Alert Enterprises, Inc. v. Johnson Controls, Inc.*, 2016 WL 8710798, *1 (N.D. Cal. Aug. 26, 2016) (granting motion to transfer where "it is not unreasonable to characterize Alert's lawsuit, while not in bad faith, as being somewhat anticipatory in nature"); *see generally IBC Manufacturing Co. v. Berkshire Hathaway Specialty Ins. Co.*, 2016 WL 4522665, *4 (D. Or. Aug. 29, 2016) (explaining that "anticipatory suit exception" does not apply "simply because a party anticipates litigation and sues first to obtain its choice of forum," but instead applies only where a plaintiff who "lacked a preexisting motive for going to court" filed suit based on "specific, concrete indications" that the other side was about to file) (citation omitted).

[17] One final clarification is appropriate. In reaching this determination, the undersigned is well aware that "a transfer that would only shift inconvenience from the defendant to the plaintiff does not outweigh the plaintiff's choice for Section 1404(a) purposes." *S.E.C. v. Lauer*, 478 Fed.Appx. 550, 554 (11th Cir. Apr. 19, 2012). This is not a case in which a
(Continued)

**III.     Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1. Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or, in the Alternative, to Transfer Venue (doc. 13) is **granted in part**, and **denied in part**;
2. The Motion to Dismiss pursuant to Rule 12(b)(2), Fed.R.Civ.P., is **denied** based on the Court's finding that the exercise of personal jurisdiction over defendant in this forum is consistent with the Due Process Clause;
3. The Motion to Transfer Venue is **granted** pursuant to 28 U.S.C. § 1404(a), and this action is hereby **transferred** to the United States District Court for the Southern District of New York for the convenience of the parties and witnesses, and in the interest of justice; and
4. Plaintiff's Motion to Strike Declaration of Stefan Schick (doc. 29) is **moot**.

DONE and ORDERED this 7th day of May, 2018.

                                        s/ WILLIAM H. STEELE
                                        UNITED STATES DISTRICT JUDGE

---

§ 1404(a) transfer would merely shift inconvenience from one side to the other. As discussed *supra*, other important considerations (including without limitation access to sources of proof, convenience of witnesses, practical/logistical problems with presenting potentially significant evidence in Alabama, the transferee forum's interest in the matter, and so on) demonstrate the interests of justice and convenience support a transfer in this case, particularly given the reduced deference to which Carter's choice of forum is entitled.